I'd like to just do a small introductory statement and take your questions for about five minutes. I would like to reserve about ten minutes for rebuttal if that's possible. I know that you all know Mr. Abdhir's situation. He's here on the charges of conspiracy and providing material support to a terrorist. He's also charged in 13 counts of providing goods and services to a specially designated global terrorist. And there's one count of a false statement, a material statement, which has to do with his declaration on a mailing declaring what was in the contents. These charges are all based on Mr. Rahmat Abdhir's assistance to his brother and only to his brother. His brother is involved in a struggle in the southern Philippines which has been going on for about 40 years. Over this period of time, this struggle has not been characterized as a terrorist struggle. It's been characterized by the world community as a secessionist civil war. It may be that in recent years things are changing and perhaps our appellations are changing. In all of the e-mails that the government has, in all the communications that the government has monitored concerning between Mr. Abdhir and his brother, Mr. Zulkifli Abdhir, there's no indication that my client knew of actual terrorist activity. Well, that's at most debatable, it seems. There were e-mails back and forth where the brother described the IEDs and the blowing up and the killings of people, and he seemed to be aware of that kind of activity. You're correct, Your Honor. The communications that we have concerning the IEDs, there are really two categories of communications. One, it's unclear who the targets of those IEDs are in the e-mails, and there's no reason to think that those IEDs would have been anything other than IEDs which were deployed against the Philippine military. Can I ask where you're going with this? That is, as I read your papers, you distinguish between the so-called MILF, and it's unquestioned that the brother's a member of the MILF, and the JI, and the federal government has designated the brother as a member of that. And are you arguing, I mean, where we're headed with this is that so long as this defendant is providing assistance to a struggle on behalf of the MILF, it's not a danger that we should be concerned with? I think it, yes, I think it colors our understanding of the situation. The MILF is a longstanding secessionist group who's been fighting in the southern Philippines. They have not been designated as global terrorists. They have not been considered by the world community as global terrorists. They are considered to be engaging in a civil war with differing degrees of approval by different communities. The understanding or an understanding that Mr. Zulkifli is a member of JI would perhaps make things a little bit different for our understanding towards Mr. Rahmat's state of mind. And he's been designated by our government as a member of that JI organization. No, he has not.  No, he has not. Now, what has he been designated a member of that's then the premise for the government's charging this defendant? Perhaps I'm mis-sort of cueing on the word designated. Our federal government has designated Zulkifli as a specially designated global terrorist. That comes with no explanations for why he's been so designated. And, well, no explanations for why he's so designated. He simply is so designated. There is a reward for him. The language of the reward includes the government's suspicion that he is a member of JI. As I stand here, I do not know what the evidence is that the government has that he is a member of the JI. And certainly for my client, Mr. Abdir, Mr. Rahmat Abdir, there is no indication that he knew that his brother was a member of JI. There's no indication that he participated in discussions with his brother about the goals of JI, about terrorist goals in general, or anything else of that nature. All of those communications with his brother are devoid of that kind of discussion. And is the charge in the indictment providing assistance to someone who has been designated, or does it go further than that and charge assistance to someone who has been designated and who is engaged in terrorist activities? I think the charges, there are two different charges. One is simply providing material assistance to a designated global terrorist. I, I, that only requires, I believe, a government showing that material assistance was given to somebody and that that designation was made. The other charge in this, and there are two counts, are charges under 18 U.S.C. 2339A, which is conspiring and providing actual material assistance to terrorist activity. Yeah. That sounds to me as though the government's theory is that the MILF is engaged in terrorist activity. Frankly, Your Honor, there have been indications from the White House since this was charged that the government is going to ask that the MILF be designated a global terrorist organization. I do not know where that discussion is. But I have heard that. Yes. Well, Judge Fletcher asked where are we going. Your Honor, in this case, the, the issue of bail is, is, is one where we have a legal argument as well as a kind of factual conclusion argument for bail for Mr. Rahmat Abdir. The, the Bail Act, Bail Reform Act, does not contemplate detaining someone for being a danger outside of our community. That is what the district judge did. What, what does community mean? Normally you would think that the community would be the area around, say, Los Angeles. Someone's indicted in Los Angeles and see a danger to the community. One definition of community, and the most reasonable one, would ordinarily be the community in which he is. I see. But that's been expanded to include the entire United States. What is it that makes the United States a community and not the world a community? Our laws and our Constitution, which provides and protects us in our relationships to each other. It may very well be, Your Honor, that an entity wants to detain Mr. Rahmat Abdir as a danger. Perhaps the Philippines does. That would be properly approached not through our Bail Reform Act as a kind of preventive measure on behalf of a foreign government, but through the State Department and through laws concerning extradition and our international relations in general. The Bail Reform Act is not the place to protect the individuals that belong to a different nation. Well, that's a nice statement. But if you were to say in normal conversation somebody is a member of the community, you would think the community in which you're living or you're talking about. Community has been expanded, however, as I said. Community means everybody in the country, which is you'd normally use a different term, if you were talking about the community, than the entire country. Why not the entire world? Because I don't think our Constitution reaches that far, and I don't think it should reach that far in the context of Bail Reform. Well, we're designating somebody as a foreign terrorist, even though he's not in the United States. The Constitution seems to reach that far unless you're challenging the ability to designate foreign terrorists. I think all of those issues have been very much alive before the courts in recent years. I think I just heard you make at least the beginning of a constitutional argument that if we were to construe the word community here to include communities outside the United States, that this statute would be unconstitutional. Do you seriously mean that? Yes. That's not an argument you made in your papers. If the community is construed in such a way that it is meaningless because it has no bounds, then the constitutionality of the Bail Reform Act, I think, is in jeopardy. So that's not an exterritoriality argument. That's a meaningless term argument? It's a meaningless term, but it's also a due process, and it's a due process argument as well. Could I ask kind of a hypothetical question? If an American wanted to visit, say, Dupont-Zamboanga or some other community and visit his friends there, but he wouldn't go because of the hazard created by this group, whether the IJ or whatever it is, why isn't that pre-determination of travel a burden on our community, the people from here who might want to go there to visit friends? The situation has arised. We do have travel advisories that we give people not to travel in certain areas because they're dangerous. If the argument were that Mr. Abdir were posing a danger to Americans overseas, then that could be part of our community. That's not the argument the government made. If the argument were that there were specific individuals that Mr. Abdir posed a danger to overseas, then I think clearly the Bail Reform Act could encompass those individuals, specific persons. Even a foreign individual? Yes, I think so. Why is that? Why is that a constitutional theory? I think that in the context of a criminal proceeding, if there are specific individuals who are endangered by the liberty of the defendant, then I think a court... Why is it all right for a foreign individual and not a group of foreign people who live in a particular area? Because the Bail Reform Act is not written that way. Because the Bail Reform Act refers to persons, any person, and the community, which means any person which is named and the community, which is a flexible term but is not infinitely flexible. You know, we're down to the last minute practically. Why don't you get on to the question of the conditions that would be satisfactory? I think, Your Honor, I think the pretrial services in San Jose gave very good and reasonable conditions under this situation. They could be augmented. He could be ordered not to have any kind of telecommunication devices and not to use any kind of telecommunication devices. He could be put under house arrest, which was suggested. He could be put on global monitoring, which was suggested. The pretrial services has a remarkable ability to keep track of where people are going. Given this particular defendant's situation, we are not speaking about a situation like in Tortura where there is an organization behind these people, and Confederates and others are very likely to participate in creating a danger to the community. Here, Mr. Rahmat Abdir was simply sending money and supplies to his brother. There is no indication through all the years of e-mails that there are Confederates. This situation is much more easily controlled, and pretrial services had confidence that it could reasonably assure the safety of others and the community. It was only when it was asked to ensure the safety that pretrial services admitted it cannot. But that is not a standard to which pretrial services nor this defendant should be held. Can you tell me what is the present status? Is he incarcerated now?  Which means that he gets about two hours a week to get out of his cell to take a shower, to make phone calls. He can visit with counsel whenever counsel comes to the jail, and he has some visitation rights with family members and others. But he's in a single cell. Where is he? In Santa Clara County Jail. He is shackled whenever he is moved, and that is simply because of the nature of the charges. It's both to protect him and to protect others. Is there a trial date? There is not a trial date. And I would also like to mention to the Court that I made an application for security clearance for some of the evidence in this matter, which is covered by SIPA. My application went in September 25th. I still do not have security clearance. I cannot tell this Court when this will go to trial or how long it will take before we know the full parameters of this case. Thank you. We'll give you time for rebuttal. Thank you. Good morning. May it please the Court. Again, my name is Joanna Baltus, and I represent the United States from the Department of Justice. So I don't forget. Yes. On our last question, when do you expect to have a trial date? It doesn't seem to be a very complicated case. No. The government is ready for a trial date whenever the district court sets a date. We have completed all of our discovery to the defense, and our next status hearing is in a couple of weeks, and we would hopefully be requesting suppression hearing dates at that point. Nothing has been filed by the defense yet regarding any of the evidence in this case. It sounds like you haven't finished your discovery about this particular lawyer because he doesn't have a security clearance. Well, actually, just to briefly touch on that, all the evidence in the case that the government has turned over we have declassified. There was a substantial amount of evidence that did have to be declassified, and that has occurred, and all of that discovery has been turned over. So at this point, the government doesn't anticipate that there would be any additional discovery that would require a security clearance. If something came up at that point, we would address it, but there's nothing, no discovery has not been declassified. Does that mean that the government is not pursuing granting a security clearance to your adversary? It's actually not up to you. Yeah, it's up to the court security officer if there's any evidence that actually needs to be turned over, and at that point, nothing is. No, I'm asking you a different question. He has apparently asked for a security clearance. Those require investigations by the FBI and so on. And that has occurred. It's finished? To my knowledge, the court security officer has received his application, and all of the background checks have been conducted. The second step would be then to actually determine whether there's a need for a security clearance. And because there's been no discovery that is deemed in that area, no, he has not been granted a security clearance. Now, this is a bit of a detour, but I do want to pursue it. Does that mean that as soon as security information is relevant, he will be instantly granted the security clearance? I don't understand why you don't just get it to him so that we're not faced with a three-week delay as soon as he plausibly charges or plausibly says that, listen, I need access to this classified material. My understanding is that, and again, I'm not the one in charge of doing this. It's done by the court security officers. But my understanding is that if there is a need for a security clearance, once they have finished the background check, which my understanding is that that has happened, that it's very quick. I can't say it's instantaneous, but I don't think it's more than a couple of weeks to actually grant someone that. Well, a couple of weeks in the middle of a trial is a long time. Well, honestly, obviously, if there was any issue that information would be – would come up in the middle of trial, certainly we would address that before trial. And the government is in no way hampering any efforts by the defense to have access to any information. And we've declassified all of the material in this case that has been transmitted. But you deem it relevant. And that's why we have the CEPA proceedings, and we've gone in front of the district court judge for that as well. And in no way is the government attempting to slow down the proceedings. We would be happy with the trial date next month. I don't understand why you can't give a lawyer a security clearance just because you don't think at the moment there's anything that he needs to know. Well, it's actually not up to us. I mean, if Mr. Humey feels that he needs a security clearance and wants a security clearance, I think he can probably apply to the court security officer to give it to him. We've not said don't give him a security clearance. At this point, we've just said that there's no material that we plan on providing that would require a security clearance because it's been declassified. Have you said that you don't oppose the granting of a security clearance? It doesn't make a difference to the government one way or another whether he gets a security clearance. I think it's just more of a question of whether it's necessary, and it's probably an issue of resources for the court security officer that actually has to grant  If there's no reason to grant it, then they can't. This is the district court in San Jose or wherever it is? It's the court security officers that handle it. I mean, is that a local court security officer? No, no. She's from Washington, D.C., and she travels. There's a group of them that handle cases where there's classified information. All right. Is the trial scheduled? Well, it's not scheduled yet, but will it be in San Jose? It will, Your Honor. And before Judge Fogel? Yes. If I might address some of the issues that the Justice has had questions about. First of all, Zulkifli Abdir, the defendant's brother, has been a specially designated global terrorist, and that happened in 2003. It is not necessary for the government in that designation to necessarily tie the person to a specific organization, although the information that the government has leads them to believe that he is part of Jamia Islamiyah and also part of KMM, which is a Malaysian Islamic radical group. I don't think there's any – the government doesn't seem to think that there's an issue about whether or not he is or is not MILF. We certainly have not asserted he is MILF. However, MILF has been engaging in terrorist activities as well. So it's the fact that he's been designated a global terrorist by the United States government is the issue in this case, and that's where the material support charges are derived from. It's the fact that the defendant in this case was aware of his brother's designation as a global terrorist, and he continued to send material and support over to his brother in the Philippines. And if you look at the e-mails, they are pretty clear that the defendant in this case was aware that his brother was involved in terrorist activities. Zulkifli Abdir would send articles, and the defendant would send articles, which discussed the civilian bombings and discussed – Yeah, you're kind of begging the question in the same way that Mr. Himley was begging the question, that is to say you're calling them terrorist activities. It's clear, as I look at what evidence I can gather through the excerpts of record here, that you've got a lot of evidence that this defendant was providing material support to his brother who was engaged in activities that resulted in killing. Now, the label terrorist, I'm not sure whether to apply that or not. Well, when we use the term terrorist, we mean he's been designated a global terrorist by the United States government. He seems to be engaging in terrorist acts. So if that – Well, but you see, that goes to the point that I'm not quite sure the relevance as to the question in front of us, but there's some killings that are terrorist acts and there's some killings that are not. Armed revolution is maybe not terrorism. It depends on all kinds of other questions. Right. And I think that obviously Mr. Himley's attempt to characterize Zulkifli Abdir as part of MILF is an attempt to shift the focus away from indiscriminate civilian bombings to some type of legal successionist movement. Certainly, the government would acknowledge that MILF has been involved in peace talks with the Philippine government. However, that does not mean that they don't also resort to terrorist bombings. And all of the bombings that the government has asserted that Mr. Zulkifli Abdir is involved in and the ones that are in the indictment and the ones that the articles are being sent back and forth between the two brothers are indiscriminate civilian bombings. Yeah. And I get – I mean, obviously, that's what's going to get sorted out at trial. Are they – is it terrorist bombings if they're revolutionary activities by a group that hasn't been designated as a terrorist group? I'm not sure that that's – I would argue, yes, the government would argue if they're involving – if they're engaging in terrorist activities, which are – I mean, I'm not sure how you can characterize indiscriminate civilian bombings as anything other than a terrorist act. Certainly, if someone has a lawful – Well, you know, that's a tough one. I mean, what did we do during World War II? Well, these bombings are going off in crowded marketplaces. They're killing children. There was an 8- and a 10-year-old child that were killed in the January 2006 bombings. I understand exactly what you're saying. But if your definition of terrorist act is indiscriminate civilian bombing, that's a pretty broad statement that includes a lot of behavior. So you may – again, this may be something to sort out at trial, and I don't want to discourage the government from going – But the definitional problems are going to be pretty severe. I think maybe for purposes of the detention hearing in which the district court heard a lot of this information, he was concerned that the defendant in this case was sending material support to his brother who was engaged in these bombings. Now, I agree that that will be sorted out at trial. But at this stage, that's what was before the district court, and the district court found it very compelling that the defendant was aware that his brother was designated, that he believed – at least the U.S. government believed he was engaged in terrorist activities. And in the face of the e-mails and the articles that were being sent back and forth, it's difficult to argue that he didn't know that his brother was involved, especially when his brother was specifically asking for components for IEDs in these two-way radios. Suppose somebody else who had not been designated an international terrorist, or whatever, suppose they had a cousin who was working with a brother and he sent it to the cousin. Well, actually, that has occurred in this case. The defendant used different intermediaries to send certain material and money to his brother. The e-mails that – No, no, but you – I'm assuming it's not for the benefit of the brother. If it was just someone that was not designated a global terrorist. Yeah. The charges in this case, there's two charges. There's the material support charges that are the 2339A charges, and then there's the IEPA charges, which are the specifically relate to sending material and supplies to a specially designated global terrorist. So even if Zulkifli Abdir was not designated, the government would still have a case, a 2339 case, in which the defendant in this case was providing material support to someone engaged in terrorist acts. There doesn't have to be a designation for the purposes of charging a 2339A case. It's just that someone is involved in terrorist acts and they know that they are acting on behalf of an organization or conducting those terrorist acts themselves. So that – for purposes of this inquiry, it's – there's both charges that are at play. But what the district court was faced with is the knowledge that this defendant knew that he was sending, and the district court very clearly asked pretrial services in setting conditions of release whether pretrial services could monitor what needed to be monitored to ensure that this defendant did not communicate with his brother and did not – was not able to send additional supplies over to the Philippines that could cause harm. Before we get to the – I think that's the final issue. The second issue is the community. That's an odd definition for anywhere in the world, a danger to any group of people anywhere. What is it that makes you think the community applies to the world? Well, I think that the community has to take on a contextual definition in a case like this. And quite frankly, not just in a case like this, but district court judges are faced with all sorts of cases where they might have to consider what is the relevant community for purposes of my understanding of what community could be injured here if I let someone go. Certainly in the case of a child pornographer, the district court might consider the fact that an online community might be something relevant to consider in whether releasing someone that's charged with pornography online is something that's suitable. In this case, the district court judge was faced with an issue where we – that the victims were in the southern Philippines. If you had an online case for pornography and it was a – the crime was something about the community, it would be an offense if it were – occurred only within Denmark? I'm not sure I understand your question. Are you suggesting that – well, what I was saying with the online community example is that the online community could certainly extend far beyond the local community. No, but if it only were in the local community of Stockholm, say, or Copenhagen, would that be an offense under American law? Well, it depends on – my understanding of the online cases is it depends where the server is located and whether you can derive jurisdiction. But I think for purposes of understanding whether or not there's a danger to a particular community that could be released, it's appropriate for a court to understand that a defendant's actions could affect people outside their neighborhood or their local community. And in an online community, that could target someone in Dallas. It could target someone in Copenhagen. But the district court would have no way of controlling that because once you're online, you can reach anyone. And the problem in this case is that the defendant here could reach his brother over in the southern Philippines and thereby affecting innocent civilians because of the material that he was sending from San Jose to the southern Philippines. So it's entirely appropriate, and it's not reading anything additional into the Bail Reform Act, for a district court judge to consider when they have the facts such as these that if he knows there are actual victims involved and that there is a vulnerable population, which the government was able to show in this case based on the past conduct of the defendant and his brother, that that community should not be ignored. And the defense even concedes that if it was a known person over in the Philippines and certainly the Bail Reform Act could address that. If it was American citizens that were over that, over in the southern Philippines, the Bail Reform Act could address that. But the fact that these are indiscriminate civilian innocent bombings that we don't know who the victims are, that at that point the Bail Reform Act cannot address. It would seem if the statute said a danger to a community, that might support your argument somewhat better than it says to the community. The community would seem to mean the something, the community around the area where he's operating or the community, if that means the United States, and that's an odd way to say it. Courts have done that. But the community being the entire world is an odd definition of the term. It may be plausible, but it's not certainly the first definition that would occur to you. And it might not have been the first definition that the legislators thought of when they were adding this into the Bail Reform Act. However, in light of the types of crimes, federal crimes that we deal with in this country these days, it is entirely appropriate. If we look at the, this is not a case in the Ninth Circuit, but the United States v. Al-Aryan case in Florida, the district court judge was faced with this exact situation where the, and I see I'm about to run out of time. May I? No, we'll give you more time. Thank you. The district court judge was faced with two defendants who had exemplary public records in the Tampa community. They were upstanding citizens. Al-Aryan was a professor at the university. They were very involved in civics in their community. However, they were charged with material support to a terrorist organization and it was a designated terrorist organization. It was the Palestinian Islamic Jihad. And all of the violence and all of the activities involved the Gaza Strip and Israel. And in that case, the district court thought and came out with an opinion in which he said it's important to look at the context of the charges in this case because we're dealing with Federal crimes of terrorism. These types of crimes are not the heartland of crimes that we see every day in Federal  court. This rips across the fabric of civilization. This is something worldwide that we deal with. And even though these crimes are occurring outside the United States, they absolutely affect the national security interest of the United States. Terrorism is not something that any country wants to condone. So in that case, even though the defendants were not a danger to their local community, in the context of what they were charged with, the district court found it appropriate to find that they were dangerous to the community and it was the community outside the United States. It's the exact same thing that the district court was faced with here. Let me ask you this. Assuming that I'm willing to go with the government so far as to say that depending on the circumstances of the case, a community may well include communities outside the United States, such as so that in a sense I'm reading the word relevant into the statute, danger to persons or to the relevant community, and that could include assuming I'm willing to go that far. There's an odd twist that I think the defendant's lawyer is trying to get at to this case, which is, well, ordinarily when we're talking about releasing someone on bail, there's no question but when we're trying to ensure the safety of others in the community, we're trying to ensure their safety against illegal acts. Does the government need to show here for purposes of this being safety to the community that the acts that are being assisted, not the giving money to the designated person, that's the crime, but now we're just talking danger or safety. Does the government need to show to us at this stage that the acts, that is to say the acts producing the danger, are illegal acts? Are you talking about the acts of what's actually occurring over in the Philippines or are you talking about the acts of the defendant? I'm talking about the safety that the government is now saying that it's trying to protect by keeping this man in jail, and I gather that what the safety that the government is trying to protect is trying to protect against further acts such as he's already assisted, that is to say bombings in the Philippines. In order for us to call that safety, do we need not only to conclude that the word community includes the Philippines, but that also that these are illegal acts? I think I understand where you're going. I think it's important, yes, to have a, certainly the standard of proof in a detention hearing is not beyond a reasonable doubt. It's clear and convincing evidence that the government has to show that someone is a danger to the community. I think that it would be getting into more of a full-blown trial if we had to put on, essentially on trial, every single act that the government asserted was causing violence in a particular community. So, no, I don't think that we have to show beyond a reasonable doubt that that's what happened. I think that the district court judge has to be. No, that's what happened. Are you, when you say that, are you meaning the characterization of whether it's a legal or an illegal act of violence? I'm saying what the government's asserting occurred over in the Philippines, which is why we believe it would be a danger for the defendant to continue sending supplies over to the Philippines. Yes, those acts, we believe, are acts of terrorism. Do we have to, at this point, prove that they're acts of terrorism? I don't think that the Bail Reform Act and in a detention proceeding that the government has held to that kind of a standard. I think if that was the case, we might as well just have a full-blown trial. And I don't think that that's what was contemplated. Why don't you think that the pretrial office's conditions, which they thought would be enough to assure that the defendant would not engage in these acts awaiting trial, why do you think they don't sufficiently assure that? Well, as spelled out a little bit in the brief, the investigation of the defendant prior to his arrest was quite lengthy. And the amount of surveillance that the government used against this particular defendant to find out what he was doing was around the clock. There was constant communication of his telephone and his e-mail accounts. Now, the district court judge specifically asked the pretrial services officer what type of conditions they could put in place. And the pretrial services officer could what they came up with was monitoring the defendant's monthly telephone bill once a month, would monitor the telephone bill, presumably to determine what type of phone calls he'd been making, and to ask the defendant not to use the Internet outside of work. In the government's opinion, those fall far short of the type of conditions that would be necessary to require or to ensure that this defendant could use the Internet outside of work. I only read the e-mails. There were phone calls in the case, and there were probably they were not discussed at length during the detention hearings, but the phone calls and the e-mails were monitored. How did he get phone calls through to this fellow in the jungle, the brother? I'm not sure I can go into the extent of that question. I'm not sure I know the answer to that myself, but I know that there were phone calls. I never saw anything about phone calls as far, I think, in the materials we had. I think you point out, though, something very interesting in this case, that the defendant's brother is in the marshes of the southern Philippines, which is not a very hospitable place. There are certainly not a lot of telephones and Internet cafes around, and yet But he seems to be able to do e-mail. Well, that's exactly the government's point, is that he was so dedicated in being a lifeline for providing material and support that he was able to make that happen despite being in a very inhospitable region. And that is something, that tenacity and the loyalty that these two brothers have towards each other, you know, the defendant in this case, in the face of knowing that he had been designated a global terrorist and that there was a $5 million bounty put on his brother's head, the defendant was still willing to send material and supplies. So it is with that backdrop that the district court was concerned that there would not be, it would require the defendant's voluntary compliance in ensuring that he did not communicate and send materials and supplies. And it was, that was not, pretrial services did not provide any assurance that that could happen. In fact, they said that it would be very infrequent monitoring and, again, the monthly telephone calls. But one of the possibilities that was mentioned, the pretrial services said that he wouldn't be allowed to have a computer in the house. They said, but he could use his computer at work as long as he didn't use it to communicate with his brother, which was a little odd, I thought. But they could have said house arrest, couldn't they? I assume they could have. And certainly the district court judge in this case gave both parties an opportunity to fully brief the issue and to present a set of conditions that would be appropriate. And there were no such conditions that were offered by the defense back before the district court of anything like that. And, again, you know, anything that we're trying to stop the defendant from being able to communicate with his brother and we're trying to stop the defendant from being able to send any more material and supplies. It's actually relatively easy and very inexpensive to send the types of items that caused great harm over in the Philippines. So even if the defendant lives with his wife and with young children, I mean, there would have to be 24-7, you know, surveillance and monitoring of who was coming in and out for the defendant to be able to ask someone, can you go and spend $20 on a two-way radio and send it to this address? I mean, your pretrial service would be asked to essentially step into the role of what the FBI did in a two-year investigation, which pretrial services, quite frankly, said we can't do that. We will stop in infrequently and monitor to make sure he's there. But even house arrest, with the GPS monitoring, there's no alarm that goes off when the defendant leaves the house. So it, again, is up to the defendant's voluntary compliance. I don't know if they were going to have this, whatever you have in your automobile, I don't know, so that they could tell whenever he left the house. Right. But, again, he lives with other people. This is not just him that's involved. It's his children and his wife that he lives with. And in addition, you know, he practiced very good counter-surveillance techniques during the investigation. He used aliases to send packages. He used intermediaries. He used his family. You know, would we come up with a list of every single person that he could have evidence that he had actually had other people send him? He used intermediaries. He used his mother's bank account to send money to his brother. He used his brother's bank account to send money to his brother over in the Philippines. He used many different aliases. I mean, he was covering his tracks, which the government argues, obviously, he knew what he was doing was wrong. And so to actually ask that kind of a person who has demonstrated that type of loyalty and those type of counter-surveillance measures to then voluntarily say, I'm not going to send anything to my brother, I'm not going to ask anyone to send anything to my brother, I'm not going to communicate to my brother or any other of my brother's associates, is something that the district court had a very hard time with. Thank you. Thank you. Counsel? Thank you, Your Honor. I think we can just start going backwards. The government just described Mr. Abdir's activities as counter-terrorism measures. These are the most simple measures Mr. Abdir was using. There is no indication to all the investigations the government did of him monitoring all of his phone calls and all of his e-mails that Mr. Abdir has any kind of network of people to help him. There is no indication that he is inclined to have such a network of people to help him. He is not a fanatic. He is not a member of any of these groups. There is no evidence that he would engage in these kinds of things no matter what happened, which is present in all of the other cases. Let me ask you this. Assume that we go with the government so far as to hold that the relevant community under the Bail Act includes people in the Philippines and that the safety they have in mind includes safety from the sorts of acts contemplated. At that point, we're just in sort of an ordinary bail hearing in terms of what's necessary to ensure the safety. We review the decision of the district court on that point for abuse of discretion? No. I think that we're in a gray area in this, as I think the court is very well aware. The facts are for abuse of discretion. The conclusion that these measures would not suffice is a conclusion and is not given the deference by this Court or should not be given the deference by this Court. This Court has the ability and the duty to review what happened at the district level with an eye to ensure that the constitutional rights of the defendant. So let me make sure I understand your position. So you're arguing that, and I'll take it out of this case so it's an easy sort of hypothetical to deal with, just an ordinary, I don't know, murder case. The district judge, having got the facts in front of him, says, I think that considering these things and realistically considering what conditions we can put on release, that this person poses an undue risk, therefore I'm not allowing bail. Do we review that de novo? Because my impression is that that's an abuse of discretion standard. Yes, you do. It's the conclusion. And the facts underlying it, the fact that the pretrial services said we can't monitor who comes and goes 24 hours a day, that's a fact. But the conclusion that is derived from that fact is something you can review de novo and you should review de novo. As I was saying, he's not a fanatic. The pretrial services have monitored people who have engaged in crimes with computers, and they are very adept at doing so. They can monitor what someone does with his or her computer every single keystroke. They can put a program on the computer and every single keystroke can be monitored by pretrial services, and they have done that. I think in this case that might be a moot point. The only reason we thought Mr. Abdir might have to have a computer was because he had a computer at work and he used a computer for his work. Mr. Abdir no longer has that employment right now, and I don't think he's going to be going back to that. A condition that would forbid him from using any kind of computer would certainly be reasonable. The government mentioned that Al-Aryan found that the community was outside of the United States. It's clear from our papers that our position is none of the cases that were cited by the government establishes the notion that the community can be outside the United States. Persons can be outside of the United States, but not the community. Well, there's no case either way in a court of appeals, as I understand. That's correct, as far as we can tell. So it's really just a question of statutory construction? That's correct. That is correct. The district court, as the government pointed out, was very concerned that Mr. Abdir sent material support to a designated terrorist, and that that was the fact that the court used to base its conclusion that he was a danger to the community, as it was defined by the district court, and also supported the conclusion that no conditions of release would reasonably ensure the safety of that community. Again, the district court took a standard that was not contemplated by the Bail Reform Act in asking the pretrial services to ensure that none of these things could happen. But aside from that, the fact that Mr. Abdir sent support to a designated global terrorist is one which has to be seen in the context of the other facts that were established, that Mr. Abdir is not a religious fanatic. Mr. Abdir does not advocate harm to the Americans. But it doesn't matter whether he advocates harm to the Americans if we're talking about whether he's willing to help harm people in the Philippines. That's correct, Your Honor. And Mr. Abdir never engaged in discussions with his brother concerning the goals of J.I. or other groups that would be... He seemed fairly either happy or certainly satisfied that his brother was blowing up people in the Philippines. I think he believes that the secessionist movement in the southern Philippines is a righteous movement. Well, and that brings us to Judge Fletcher's question. Isn't that a terrorist activity? And I think that's an excellent question. I think that a secessionist movement is not necessarily terrorism, and I don't think the world community has seen that movement as terrorism. And we get into... If there's a global terrorist who moves from place to place helping insurrections, isn't it just as bad or just as unlawful to help that global terrorist participate in what may be otherwise just an ordinary revolution? It may be. I don't think that's the case here. There's no indication that Mr. Zulkifli is going from place to place in order to help different struggles or to instill a terrorist aspect to those different struggles. I think Mr. Zulkifli seems to be dedicated to the struggle which is going on right there. However, it is possible that a terrorist would take advantage of a volatile situation. It is clear from the world news that that is probably happening in the southern Philippines right now. One of the things that was apparent in the indictment is that the MILF had lost a very strong leader. It's certain that people in this global situation are going to take advantage of that situation. But the question that I think this court should focus on is, what does that say about Mr. Abdir's knowledge of these things, and what does that knowledge say about his willingness to be a danger to the community? I think the knowledge seems fairly strong. Reading the e-mails, his brother would say to him, look what we're going to do and take a look in your papers tomorrow and you'll see what we've done. I don't think there was much doubt that he was fully aware and willing to support those activities. The question is, to me at least, why do you think that the conditions are sufficient to make sure that he won't support his brother anymore? It's a situational kind of analysis, Your Honor. But there is no indication that Mr. Ahmad Abdir has a great degree of sophistication in being able to communicate with his brother. There are no Confederates to help him in these efforts. If he were on house arrest and if his telephones were monitored, then it would be a rather simple matter to ensure that he was not communicating with the outside world, and particularly with someone who is in the jungles of the Philippines. What does it take to monitor the telephones? Does that mean you need somebody 24 hours a day listening to the phone? I don't think in this case you do, Your Honor. I think that if this were a situation where you had, as in the Tortora case, a dedicated crime family boss who had all kinds of people out there to communicate with, I think that the dangers that somebody would make a surreptitious phone call are very great. I think in this case, because what we're worried about are calls going to the Philippines or Malaysia, that pretrial services could monitor what kinds of phone lines are going into the home, can monitor what kinds of accounts are being used to get cell phones, which could be prohibited, and can easily review phone bills to see that phone calls are or are not being made. To what extent is there evidence that other people were involved at all in this activity? The government says that he used his mother's bank account, some other bank account. Is it clear whether or not that was with anyone's consent? Your Honor, it seems clear that money was being sent to the mother's bank account, and then the mother would get it to the brother. The mother bank account was in the Philippines, and that it would then go to the brother. It seems clear from the- Is the mother in the Philippines? Yes, she's in the Philippines. I believe that the government alleges that he sent it to another family, and then it went to the brother. It is true that Mr. Hrahmat used false names on the return addresses. That is not a particularly sophisticated way of avoiding detection, and it was probably, in Mr. Hrahmat Abdir's mind, more to protect his brother from detection than to protect himself from detection. Is there anything further? The statute, the government is asking that this court rewrite the statute. What the government really wants is for there to be a rewriting of the Bail Reform Act in view of global developments, and that has not happened. This court can't rewrite it. I think the meaning of the statute is clear. The community is, no matter how you define, no matter how expansive it is within our nation, it is still within our nation. Do you have any control over when this trial starts? Have you asked the judge to set a date? Your Honor, I can do that. I may do that. At the moment, however, I am aware of at least one meeting where the government has discussed evidentiary matters with the court in camera, outside of my presence, and I do not know what the results of those discussions were. I do not know. It's difficult for my team to know what approach to take to some of our motions when we do not know if we're being denied access to things because we don't have security clearance or for other reasons, and we may very well try to reassess that strategy. But right now, we were hoping, I was hoping I would have security clearance long before this. Counselor, the government doesn't oppose a security clearance. I heard him say it. Only two weeks ago, one of the security officers was in my office interviewing me about somebody else on my team doing the background check. It seems to be taking a long time. That is of concern to all of us. Thank you. Thank you, counsel. The case just argued will be submitted.
judges: Goodwin, Reinhardt, Fletcher